**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**NEW YORK**

United States of America,

              Plaintiff,

    vs.

Seth Horowitz,

              Defendant.

Case No.   1:19-cr-00861-ER

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

I.    The offense conduct is aberrational for Seth, whose biography indicates that he has lived an otherwise exemplary life. .......................................... 2

    A.    Early Years.................................................................................... 2

    B.    Early Professional Career ............................................................ 4

    C.    Iconix ........................................................................................... 7

II.    Seth has accepted responsibility for his conduct and cooperated with the Government's investigations of Iconix and Neil Cole............................. 9

III.    Seth is a devoted husband and father, with strong ties to his friends and community. ..................................................................................... 13

DISCUSSION ........................................................................................................... 18

I.    Legal Standard ......................................................................................... 18

    A.    The Sentencing Factors................................................................ 18

    B.    Substantial Assistance to the Government................................... 19

II.    The appropriate balance of the sentencing factors demonstrates that a noncustodial sentence is warranted here........................................... 19

    A.    Seth has already rehabilitated for his participation in the fraud scheme and will not recidivate.................................................... 19

    B.    Sentencing Seth to time served is sufficient but not greater than necessary to accomplish the aims of the sentencing factors. ..................... 21

    C.    A noncustodial sentence without probation is warranted to avoid sentencing disparities. .......................................................... 21

    D.    A variance from the guidelines range is warranted here............................ 22

III.    Seth Should Not Be Ordered To Pay Restitution To Iconix's New Owners. ........ 23

    A.    Restitution against Seth is unwarranted here because Iconix is not a statutory victim. ....................................................................... 23

B.    Even if Iconix is a statutory victim, Seth should not be accountable for Iconix's costs associated with the government's investigation and prosecutions of Mr. Cole.....................................................................25

CONCLUSION...........................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Federal Insurance Co. v. United States*,
  882 F.3d 348 (2d Cir. 2018)..............................................................................23, 24

*Gall v. United States*,
  552 U.S. 38 (2007)...........................................................................................18

*Nelson v. United States*,
  555 U.S. 350 (2009).........................................................................................18

*Pepper v. United States*,
  562 U.S. 476 (2011).........................................................................................19

*United States v. Block*,
  No. 16-CR-595 (JPO), 2018 WL 722854 (S.D.N.Y. Feb. 6, 2018)...........................24, 25

*United States v. Bradford*,
  645 F.2d 115 (2d Cir. 1981)...............................................................................20

*United States v. Brown*,
  98 F.3d 690 (2d Cir. 1996).................................................................................19

*United States v. Castillo*,
  No. 03 CR 835(RWS), 2007 WL 582749 (S.D.N.Y. Feb. 26, 2007) ...............................20

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008) (en banc)................................................................18, 19

*United States v. Doe*,
  348 F.3d 64 (2d Cir. 2003).................................................................................21

*United States v. Mariano*,
  983 F.2d 1150 (1st Cir. 1993)..............................................................................22

*United States v. Nucci*,
  364 F.3d 419 (2d Cir. 2004)...............................................................................26

*United States v. Petit*,
  541 F. Supp. 3d 304 (S.D.N.Y. 2021)...............................................................24, 25

*United States v. Reifler*,
  446 F.3d 65 (2d Cir. 2006).................................................................................23

*United States v. Singh*,
   No. 13-CR-570, 2014 WL 4773982 (E.D.N.Y. Sept. 18, 2014).......................................22

*United States v. Watt*,
   707 F. Supp. 2d 149 (D. Mass. 2010) ............................................................................20

*United States v. Wong*,
   40 F.3d 1374 (2d Cir. 1994)..........................................................................................19

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
   § 78j(b)............................................................................................................................9
   § 78m(a)...........................................................................................................................9
   § 78ff...............................................................................................................................9
   § 7202..............................................................................................................................9
   § 7242..............................................................................................................................9

18 U.S.C.
   § 371................................................................................................................................9
   § 3553(a)...............................................................................................................2, 18, 19
   § 3553(a)(6)...................................................................................................................21
   § 3663............................................................................................................................23
   § 3663A..........................................................................................................................23
   § 3663A(a)(2).................................................................................................................23
   § 3664............................................................................................................................23
   § 3664(h)...................................................................................................................25, 26

U.S.S.G.
   § 1B1.3(a)(1)(B) ............................................................................................................22
   § 5K1.1(a) ......................................................................................................................19

## OTHER AUTHORITIES

*Iconix Enters into Definitive Agreement to be Acquired in "Go Private" Transaction*,
   GLOBENEWSWIRE (June 11, 2021), https://www.globenewswire.com/news-
   release/2021/06/11/2245934/0/en/Iconix-Enters-into-Definitive-Agreement-to-be-
   Acquired-in-Go-Private-Transaction.html........................................................................26

## INTRODUCTION

Defendant Seth Horowitz respectfully submits this sentencing memorandum in advance of his sentencing on November 16, 2023.  On December 5, 2019, Seth pleaded guilty to five counts related to a scheme to inflate Iconix Brand Group, Inc.'s ("Iconix") publicly reported revenue and earnings per share.  But that public acknowledgement of his role in the Iconix revenue scheme was just one step in his efforts to address the mistakes he made.  When Seth resigned from Iconix in 2015, he alerted the Board of Directors to the two transactions at the heart of this prosecution.  Both before and after his guilty plea, Seth provided extensive cooperation to the Securities and Exchange Commission ("SEC") and United States Department of Justice ("DOJ").  Over the course of four years—from 2018 through 2022—Seth met with prosecutors, FBI agents, and SEC officials more than 50 times, educating them on Iconix's complex business model and transactions, walking them in painstaking detail through the events that ultimately formed the basis of the SEC's enforcement actions against the company and Mr. Cole, and the DOJ's prosecution of Mr. Cole.  Seth worked extensively with two different teams of prosecutors to prepare for Mr. Cole's criminal trial and retrial for those events.  And Seth testified at both criminal trials as a central witness for the government—for a total of 10 days of direct and cross examination between the two trials.

As Seth's cooperation and candid testimony demonstrate, he accepts full responsibility for his misconduct.  Seth's participation in the earnings scheme at Iconix was a departure from a life otherwise devoted to family, hard work, and the importance of giving back to his friends and community.  Working under the extreme pressure of a high-profile business, and the demands of Neil Cole, Seth strayed—from his upbringing, from his family, from his friends, and from his character.

Seth's "history and characteristics" make clear that a noncustodial sentence is "sufficient . . . to comply with the purposes" of sentencing.  *See* 18 U.S.C. § 3553(a).  Although his life has been upended since his resignation from Iconix in 2015, he has done everything in his power to repair the harm caused by his misconduct at Iconix.  For the last five years, he has been a model cooperating witness in every way.  We respectfully submit that a sentence of time served without a term of imprisonment or probation is sufficient to comply with the purposes of sentencing.

## FACTUAL BACKGROUND

**I.    The offense conduct is aberrational for Seth, whose biography indicates that he has lived an otherwise exemplary life.**

### A.    Early Years

Seth is 47 years old; he was 37 years old at the time of the offense conduct.  He grew up in Brooklyn, New York, and then Manalapan, New Jersey, the son of George and Renee Horowitz.  For much of his early childhood, Seth's father, George, was a GED teacher in the Brooklyn House of Detention, and then, later in Seth's childhood, George started his own successful business.  His mother was a homemaker and librarian in a public school.

Seth has always maintained close relationships with his parents and his younger sister, Robin.  Seth's mother, Renee, in her letter to the Court, speaks of his warmth as a young boy, their close relationship as he grew up, and the pride she felt as he worked hard and excelled in school.  Ex. B at 1-2.  His sister, Robin, echoes her mother's comments.  Seth was "more protective of [her]" than even their parents were and she "idolized him."  Ex. C at 1.  But in particular, Seth adored his father, George Horowitz.  George Horowitz "was Seth's best friend and someone Seth looked up to."  Ex. B at 1.

Seth was a good student and loved playing sports, especially soccer.  Robin notes, "[w]hile academic success came naturally to him, athleticism required unwavering determination

2

and hard work[.]"  Ex. C at 1.  Most of all, she admired his resilience: Robin writes of Seth's ability to recover from setbacks, including numerous sports injuries, "from separated shoulders to torn ligaments and even major knee reconstruction surgery."  *Id*.  When Seth was told that he would never succeed at soccer because of his height, he worked that much harder and earned a soccer scholarship to attend the George Washington University.

The letters submitted on his behalf from family and childhood friends speak to Seth as a loyal, good friend and teammate.  Robin writes of his "unique charisma" and his election as "Mr. Manalapan," which she thought was the "perfect match for his personality."  *Id*.  "People naturally want to be around him because his personality is magnetic."  *Id*.  Seth's college friend Matt Schwartz recalls that, after Seth tore his ACL during their freshman year, Seth received enough get-well cards to make their dorm room "look[] like a [H]allmark store."  Ex. G at 1.  Mr. Schwartz notes how "Seth was instantly the center of our social circle and people are instantly attracted to his authenticity and warmth as a person."  *Id*.  Seth's college friend Adam Geisler—who would later marry his sister—describes the "brotherhood" Seth built and how "[h]e was such a caring, infectious leader who wanted to ensure that all of his friends lived life to its fullest[.]" Ex. D at 1.

In his relationships with others, Seth has always been a role model.  His mother recalls, "Seth was a friend to everyone he met. . . . He's the kind of man you want to stand with and to have your back.  In sixth grade Seth's school principal asked him to mentor a fellow sixth grader who needed someone his age to guide him and teach him how to be a better person."  Ex. B at 1. His sister highlights: "[g]rowing up, I idolized him not because he was perfect, but because he was imperfect, making mistakes and facing failures, yet always holding his head high, giving life his all."  Ex. C at 1.  And Seth's friends of 30 years, Rebecca and Robert Siegel, emphasize

Seth's inclusivity.  Mr. Siegel met Seth when they were in college together: "Seth was a junior and one of the first of the 'older guys' to reach out and invite him into the group."  Ex. E at 1. Seth has always cared about others and sought to be a positive influence on the people around him, which are values instilled in him by his parents.  These traits have carried Seth through his childhood, his college years at the George Washington University, and his career.

### B.      Early Professional Career

When Seth was still a young child, his father switched careers and began working for an apparel company.  George Horowitz started as a worker at the company's distribution center and worked his way up to an office job.  He remained with the company until 1994, when he left to start his own apparel business, Active Apparel Group.  When Seth was in college, he spent his summers working in various departments at Active Apparel Group, eagerly learning about the business.  He graduated from college in 1998 and went to work for Active Apparel Group full time, starting in the marketing department.  Reflecting his charismatic nature and excitement to help others, several of Seth's college friends joined him at the company.  Exs. D, H.

Due to George Horowitz's lifelong passion for boxing, he had always dreamed of owning Everlast, a boxing equipment manufacturing company.  When George learned that Everlast was being sold, Seth wrote a letter to Everlast's owner without his father's knowledge explaining why his father was the right person to buy the company.  Seth's initiative was rewarded when Active Apparel Group's acquisition of Everlast closed on October 24, 2000.  Active Apparel Group changed its name to Everlast Worldwide.

Over time, following his father's example, Seth worked his way up through the company. Robert Friedman, an attorney and longtime acquaintance of Seth's, writes about this time in Seth's career, observing, "[h]e was an eager employee— looking to learn all that he could about the business and just trying to do well and make his dad proud."  Ex. L at 1.  Following the

acquisition of Everlast, Seth was named Vice President of Global Equipment, which made him responsible for the design, manufacturing, importing, and wholesale of boxing equipment.  He worked with third-party factories in China and India and ran two factories and distribution centers in the United States (one in the Bronx and one in Moberly, Missouri).  In 2003, when he was just 27 years old, he was promoted to Chief Operating Officer and Executive Vice President.  His responsibilities broadened to include strategic planning, licensing, and global marketing.  The traits and skills he had cultivated as a child, including his positive attitude, strong work ethic, and resilience, served Seth well as he assumed greater responsibility at Everlast Worldwide.  Around this time, Seth also met his future wife, Lori, and they married in 2004.

Seth's time at Everlast was principally defined by the loss of his father, George.  While the entire Horowitz family was extremely tightknit, Seth and George were particularly close.  Seth looked up to George not merely as a father—but also as a friend, mentor, and business partner.  The Siegels emphasize the relationship between Seth and George:

> When we think about Seth, it's impossible to separate him from the special relationship he had with his dad, George.  Witnessing Seth and his dad together was seeing an extraordinary friendship between father and son.  For years, Seth and George's relationship has been a source of inspiration and admiration for Rob and I as parents and as children.  As we have had the chance to see Seth with his own children, we have seen how he has carried on George's extraordinary regard for family.

Ex. E at 2.

George Horowitz was diagnosed in 2005 with a rare form of kidney cancer.  Seth was with George when his father received the diagnosis, and George leaned heavily on Seth during the following months as he battled cancer.  Just five months after his diagnosis, George passed away.  Seth was only 29 years old.  George's passing created a deep wound for Seth.  As Seth's brother-in-law, Adam, notes, it was a "devastating loss."  Ex. D at 1.  Seth's sister, Robin,

describes George's passing as creating "a void that seemed impossible to fill."  Ex. C at 2.  And the loss of George created tremendous pressures for Seth.  He was grieving his father's untimely passing, helping his mother and sister with their mourning processes, and caring for his new wife who was then pregnant with their first child.  Seth's mother notes that, following George's passing, Seth "stepped up to become [her] point man, much more than a son.  He helped [her] with every part of [her] life in such a caring and responsible way."  Ex. B at 1.  Robin notes the same.  Ex. C at 2 (commenting that after George's passing, Seth "stepped up").

And the loss of George also left Everlast without its leader.  Everlast's Board of Directors turned to Seth, and named him Chairman, CEO, and President of the company in 2005.  Seth suddenly became entirely responsible for the company's day to day operations and licensing business.  At the age of 29, in addition to caring for his mother and sister and raising a new family, he was running a public company, which placed on him monumental burdens.  Despite these pressures, Seth remained a devoted family member, business leader, and friend.  Seth's mother writes, "[i]magine being twenty-nine years old with so much resting on your shoulders" and his wife recalls that "[h]e handled it all with such care and grace while dealing with his own feelings of loss and sadness. . . .  It was a very tough time in Seth's life and he was able to keep his priorities in order."  Ex. A at 1; Ex. B at 1.  Seth's brother-in-law, Adam, writes that, "[d]espite his grief, Seth rose to the occasion.  He led the company with passion, determination, and a vision[.]"  Ex. D at 1.

By 2007, under Seth's leadership, Everlast Worldwide's financial performance had strengthened, and the business was successfully sold to Sports Direct, a UK company.  Seth then joined Modell's Sporting Goods, first as Senior Vice President of Marketing and Merchandising

and then as President.  He remained with Modell's through the end of 2011.  Seth joined Iconix in 2012.

### C.    Iconix

Seth knew Neil Cole socially through their involvement in Aish, a Jewish nonprofit organization, and in 2011 Mr. Cole approached him about joining Iconix.  At the time, Iconix was a publicly held brand management company licensing brands (such as London Fog, Massimo, and Rocawear) to retailers and manufacturers.  Following completion of a consulting project for the company and several rounds of interviews, Iconix hired Seth in 2012 to be President of the company's Men's Division, which entailed managing men's licensing relationships.  In Spring 2014, Seth was promoted to the position of Iconix's Chief Operating Officer ("COO").

As COO, Seth interacted with Mr. Cole daily.  Mr. Cole was Seth's boss and direct supervisor.  Seth at first looked up to Mr. Cole, but he could be a challenging and demanding authority figure.  Seth testified to the harsh culture at Iconix.  First Trial Tr., Oct. 6, 2021, 73:12-16 ("Q.  How would you describe Mr. Cole's management style?  A.  Neil was a very aggressive leader.  He was mean.  He was a yeller.  I would say that, at times, he was abusive of the people that reported to him, verbally.  He was a difficult person to work with."); Second Trial Tr., Nov. 7, 2022, 684:19-22 ("As I experienced Neil's management style, it was a wide range.  He could be charismatic, charming as a successful executive.  He also was, to me and others in front of me, a screamer, abusive, and used lots of foul language."); *see also id.*, Nov. 8, 2022, 1059:25-1060:1 ("I wouldn't say I was dissatisfied with my role, I would say dissatisfied with the culture.").  Other witnesses corroborated Seth's testimony.  First Trial Tr., Oct. 18, 2021, 1198:1-2 (Schaefer Direct) ("Q.  What was your impression [of Mr. Cole's management style]?  A. Tyrannical I would say."); Second Trial Tr., Nov. 3, 2022, 255:10-13 (Schaefer Direct) ("What

was [Mr. Cole's] management style?  A.  I would call it tyrannical.  Q.  In what respect?  A. Very demeaning, constantly calling me names."); *id*., Nov. 10, 2022, 1375:12-13 (Alford Direct) ("Neil was an exacting and tough business manager.  He expected a lot from people.  He was demanding.").  Mr. Cole himself acknowledged that he "was pretty intense."  Second Trial Tr., Nov. 17, 2022, 2358:8; *see also id*. 2358:20 ("I was tough, hardworking, intense.").  The culture of abuse at Iconix—created and perpetrated by Mr. Cole—was powerful enough to make employees cry.  *Id*., Nov. 10, 2022, 1348:9-13 (Q. "What are you referring to there?  A.  An employee that Neil berated in front of others and made him cry.  Q.  Is that the only time that happened?  A.  No.").

Mr. Cole was deeply focused on Iconix's reported revenue.  Second Trial Tr., Nov. 10, 2022, 1347:20-1348:2 ("Q.  [Seth], during your time at Iconix at the time of the June and September 2014 joint ventures, did Mr. Cole seem concerned about revenue?  A.  Yes.  Q. Would you describe him as being relaxed and not caring about whether the company made revenue numbers during those times?  A.  No.").  The culture at Iconix and pressure to deliver strong returns led ultimately to a scheme to inflate Iconix's reported revenues and earnings per share—a scheme in which Seth regrettably participated.  At its core, the scheme at Iconix involved two joint ventures with an entity called Global Brands Group Asia Limited ("GBG"). In each instance, Iconix sold interests in brands at inflated prices, with Iconix secretly reimbursing GBG for the overpayment.  At Mr. Cole's direction, Seth was involved in negotiating the fraudulent deals with GBG.

On April 13, 2015, Seth submitted a letter of resignation to Iconix's Board of Directors, alerting the board to the adjustments to the purchase price in the two joint ventures with GBG— the June and September joint ventures that form the core of the SEC investigation and DOJ

prosecutions.  Ex. W (Resignation Letter); Second Trial Tr., Nov. 2, 2022, 108:16-110:2

(describing Seth's resignation letter).  That letter caused the company to launch an internal

investigation of the transactions; several months later, the company publicly reported the results

of that investigation and Mr. Cole's departure from the firm.  When the SEC opened its

enforcement investigation into Iconix later that year, Seth began cooperating with SEC

enforcement staff, providing them with documents and extensive information about Iconix's

business.[1]  Seth ultimately entered into a formal cooperation agreement with the SEC.  Ex. U;

Second Trial Tr., Nov. 8, 2022, 1031:2-4.  And when the DOJ opened its criminal investigation

into Iconix in 2018, Seth began his cooperation with the criminal authorities.

## II.  Seth has accepted responsibility for his conduct and cooperated with the Government's investigations of Iconix and Neil Cole.

On December 5, 2019, Seth pleaded guilty to five counts in connection with the joint

venture transactions with GBG and efforts to conceal them from auditors and the SEC.

Specifically, Seth pleaded guilty to: (1) conspiracy to commit securities fraud, make false filings

with the SEC, and improperly influence the conduct of audits in violation of 18 U.S.C. § 371; (2)

conspiracy to destroy, alter, and falsify records in federal investigations in violation of 18 U.S.C.

§ 371; (3) securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff; (4) making false SEC

filings in violation of 15 U.S.C. §§ 78m(a) and 78ff; and (5) improperly influencing the conduct

of audits in violation of 15 U.S.C. §§ 7202, 7242, and 78ff.

In the almost five years since he began meeting with the DOJ, and four years since

entering his guilty plea, Seth has been an exemplary cooperating witness.  Seth not only

produced his notes, journals, and other documents to support the government in its investigation,

---

[1] The conspiracy charge with respect to destroying and falsifying records in a federal investigation relate to an earlier inquiry from the SEC's Division of Corporation Finance that took place while Seth was employed at Iconix.

but he guided the government attorneys and FBI agents through the labyrinth of Iconix's

business transactions and arrangements.  He met with government attorneys more than 50 times

while they were investigating Iconix's joint ventures and preparing for Mr. Cole's two criminal

trials.  *See* Second Trial Tr., Nov. 8, 2022, 1029:3-5 ("Q.  Is it possible you met over 50 times

with the government . . .?  A.  Yes."); First Trial Tr., Oct. 13, 2021, 683:14-17 ("Q.  And in the

last few weeks you've met with the government about nine times, correct?  A.  I'd say I met with

them approximately that amount of times over the last month or so."); Second Trial Tr., Nov. 8,

2022, 1030:1-3 ("Q.  Is it possible that those meetings exceeded, you know, 10 or 15 meetings?

A.  Yes.").  Seth's meetings ranged from four to six hours each.  Second Trial Tr., Nov. 8, 2022,

1038:3-5.  Seth provided 10 days of trial testimony for the government.  Throughout, he fully

and truthfully answered every question asked of him.  His testimony was pivotal to the

government's prosecution of Mr. Cole, who was convicted of eight counts following his second

trial and was sentenced on October 10, 2023.

     During his trial testimony, Seth was forthright in acknowledging his role in the scheme.

*E.g.*, First Trial Tr., Oct. 6, 2021, 60:9-16 ("A.  I pled guilty to securities fraud, causing the

inflation of revenue and [earnings per share] for the company, destruction of documents, and

providing false information to the SEC.  Q.  Why did you plead guilty to those offenses?  A.  I

pled guilty to those offenses because I am guilty of those.  Q.  Did you commit those offenses?

A.  Yes, I did."); Second Trial Tr., Nov. 4, 2022, 649:24-650:1 ("Q.  Did you commit any crimes

while working at Iconix Brand Group?  A.  I did."), Nov. 4, 2022, 651:22-25 ("Q.  [Seth],

generally speaking, what was fraudulent about the deals in June and September of 2014?  A.  We

inflated the prices of the joint ventures with promises of givebacks in order to hit our financial

goals.").  Seth accepted full responsibility for his actions and knows that they were wrongful.

Seth's testimony was pivotal to Mr. Cole's conviction.  Seth testified about Mr. Cole's involvement in the negotiations with GBG, communications between himself and Mr. Cole about inflating the prices of the joint ventures with GBG, and Mr. Cole's efforts to cover up the transfer of overpayments to GBG through the preparation of fraudulent marketing invoices.  *E.g.*, Second Trial Tr., Nov. 7, 2022, 708:21-24 ("Q.  Can you generally describe [Neil Cole's] level of involvement in the negotiations[?]  A.  Neil was very involved in the details and negotiations of this joint venture."), Nov. 7, 2022, 735:12-15 ("A.  During the first couple of weeks of June, Neil and I discussed having GBG pay an inflated price for [a joint venture] in exchange for letting them out of future payments they owed to Iconix."), Nov. 8, 2022, 888:25-889:2 (describing how fraudulent marketing invoices needed to "look more real . . . and that they couldn't be round numbers.").  He described in detail how the scheme worked.  Despite the difficulty of testifying about these events, under intense pressure and lengthy cross examination, Seth testified candidly and consistently about the underlying events.

Seth's testimony was critical to the government's case and referenced throughout its summation in the second trial.  Second Trial Tr., Nov. 21, 2022, 2617:14-18 ("Seth Horowitz told you that the $5 million for SEA-2 and the $5 million in market expenses were also connected.  He said the deal price went up because they agreed to give the $5 million back to GBG in the future."), Nov. 21, 2022, 2617:20-23 ("Horowitz told you that the extra $5 million was going back to GBG.  And Horowitz told you that for SEA-3, Cole agreed to relieve [GBG's] shortfall in exchange for $6 million on that deal."), Nov. 21, 2022, 2632:20-22 ("As Horowitz testified, the invoices needed to look more real in case anybody from accounting would look at them."), Nov. 21, 2022, 2634:20-21 ("Remember how Horowitz told you that Mr. Cole became uncomfortable paying GBG for Peanuts marketing?"), Nov. 21, 2022, 2635:14-17 ("Horowitz

testified that it's obvious.  'The details of all of the allocations refer to the details of how we're going to pay back GBG for the inflated prices.'"), Nov. 21, 2022, 2636:2-4 ("As Horowitz recalled, Ethan Cole said, we don't care which ones you pay.  Just pay us.  It wasn't about the invoices.  It was about the giveback."), Nov. 21, 2022, 2640:6-8 ("But in the end, I think Seth Horowitz said it best.  The invoices were really just to cover, something to pass a sniff test."), Nov. 21, 2022, 2648:11-13 ("Horowitz testified that Cole wanted the payments to line up when the Rocawear Kids royalties would be due."), Nov. 21, 2022, 2653:10-12 ("Neil Cole sent millions back for the SEA-3 overpayment too.  So remember when Horowitz talked about sending money back through MENA?  That is, in part, exactly what happened."), Nov. 21, 2022, 2656:13-19 ("The first reason that you know that Neil Cole was in on the scheme is because the people who worked with him in the scheme said he knew about it. . . .  Horowitz said so."), Nov. 21, 2022, 2658:3-4 ("You sat here for two days as Horowitz walked through email after email, note after note."), Nov. 21, 2022, 2666:5-8 ("Well, Cole tried to rewrite history. . . .  But both Jason Schaefer and Seth Horowitz told you about the argument between Cole and Horowitz over whether Cole would be identified."), Nov. 21, 2022, 2666:11-13. ("And Horowitz told you that he refused to let Cole erase him, his own involvement, and that Horowitz ultimately prevailed."), Nov. 21, 2022, 2666:23-24 ("As Horowitz told us, several of the large brands were in a state of decline."), Nov. 21, 2022, 2667:2-5 ("To make up for declining revenues, Cole had turned to joint ventures.  And that was fine, but it was sort of like a drug you heard from [Seth], something that Iconix got hooked on and became addicted to."), Nov. 21, 2022, 2672:20-22  ("Horowitz told you that they kept the terms of the deals from the accounting people because they wanted to be able to recognize the higher prices[.]").

At Mr. Cole's sentencing on October 10, 2023, the Court acknowledged that Seth and Mr. Cole testified to divergent accounts of the fraudulent scheme.  The Court credited Seth's testimony, but not Mr. Cole's.  Sentencing Tr. 8:21-9:2; *see also id.* 6:24-7:4.

In addition to his plea, and his cooperation with the DOJ and SEC, Seth has also taken steps to address losses incurred by Iconix as a result of his conduct.  █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████  Ex. V at 2-6.

## III.  Seth is a devoted husband and father, with strong ties to his friends and community.

Seth's participation in the revenue scheme at Iconix was a profoundly consequential misstep, but fundamentally at odds with how he has otherwise led his life.  As reflected in the many letters of support submitted on his behalf, Seth is a devoted husband and father, community member, friend, and colleague.  To this day, Lori describes her husband as her "best friend."  Ex. A at 2.  Seth and Lori have three children: █████████████████

███████████  – and the letters universally describe Seth as a loving and deeply attentive father.  Lori writes about how devoted Seth is to his children – how Seth makes a concerted effort to develop a unique relationship with each of his children, spending one-on-one time with them, helping them through crises, and taking an interest in their lives.  Seth's sister, Robin, writes how he "excels as a father, making each of his children feel incredibly special, a role he takes very seriously.  He is a constant in their lives offering them regular support and love the way only a parent can."  Ex. C at 2.  Lori points out that his son, ██████ "prefers to stay at home and watch sporting events with Seth rather than with his friends."  Ex. A at 2.  Jonathan Mitrani, a friend of Seth's through their sons' basketball team, notes that Seth is "consistently genuine

with his son." Ex. P at 1.  The Siegels "have seen how [Seth] has carried on George [Horowitz]'s extraordinary regard for family.  Even when in the middle of the cacophony of friends, Seth pauses to connect to his wife, make silly faces over FaceTime with his son, recognize an inside joke shared with [his] daughter, or even just bring his oldest along to be part of the fun."  Ex. E at 2.

Seth's devotion to family extends well beyond his children.  After his father-in-law required a bone marrow transplant during the COVID pandemic, and in the midst of preparation for Mr. Cole's trials, Seth became the sole caretaker for his children so that his wife could stay with her mother; and after his father-in-law developed Legionnaires' Disease and required emergency treatment while hospitals were still under severe pandemic restrictions, Seth was the principal liaison between the family and the medical staff, ensuring that they knew that his father-in-law was a transplant patient and was otherwise cared for properly.

Seth is very involved in his community.  Ten years ago, he began to volunteer coach youth sports teams, both basketball and soccer.  Over the years, what began as a way to spend more time with his children has expanded into a passion—Seth has coached over a hundred neighborhood children on teams that include his children and many that do not.  Lori describes the joy and pride she feels walking their dog together through the town park, as innumerable children will come up to Seth and say, "Hi Coach."  Ex. A at 2.  Josh Smith, one of the other team parents, commends Seth's involvement, writing:

> Seth is hands down the most involved parent on our team.  Seth organizes additional tournaments for all our boys to play in.  He dedicates his own time to make sure these boys are getting the most out of the sport as possible.  I have never seen a parent who takes such initiative, and he is not getting compensated in any way.  He is constantly putting others' needs before his own. His generosity is unparalleled.

Ex. R at 1.  Jonathan Mitrani notes that Seth has volunteered to be a stand-in coach when needed

and that the players love him: "Truthfully, all of the kids look forward to when Seth steps in to

coach.  He brings out the best in them."  Ex. P at 1.

Seth's community involvement extends beyond coaching.  While living in Manhattan, he

became involved in a religious education organization called Aish Global and ultimately became

the group's Chairman.  Rabbi Adam Jacobs, who ran the group, highly values Seth's

contributions: "He was extremely generous—with his resources, his connections, his time and

his leadership.  He served an invaluable role within the organization and helped us to achieve

much more than we would have on our own."  Ex. T at 1.  Upon moving to Englewood Cliffs, in

addition to coaching, Seth helps with local park upkeep and wildlife tracking , and he

volunteered at his children's school during the COVID pandemic as a teacher's aide.

Undoubtedly, one of the most important things to Seth is his relationships with those he is

closest to.  In addition to his family, Seth has always maintained a wide circle of devoted friends,

who speak of his loyalty, energy, and inclusiveness.  The Siegels write,

> What makes Seth so amiable is not just that he is charming, it's that he is genuine
> and generous in the way he cares for his friends. To this day, he is the first friend
> we text when we can't find our group at a concert. He is the friend who will make
> sure you're not walking to the car alone. He is the person who always makes
> room for one more. Seth cares deeply for his friends and goes out of his way to
> take care of them.

Ex. E at 1.  The Siegels' comments are echoed by Mr. Schwartz, who writes that Seth "has a

heart of gold and would do anything for a friend.  Seth is the kind of person that everyone wants

in their corner."  Ex. G at 2.  Seth's colleagues, past and present, feel the same way.  Jason Levas

notes that even early on in his career at Iconix he "made people feel good about their jobs and

themselves."  Ex. H at 1.  Shannon Fay, who worked for him at Baked by Melissa, where he was

CEO after resigning from Iconix, describes his management style as follows:

> Seth is a teacher by nature – the sort of person who will slow down, be present, and help you to learn. He would start most meetings providing context, ensuring everyone had the information and understanding they needed to make the meeting successful. He would engage people in those meetings, and encourage people to speak up. As someone who hadn't gone to business school, his explanations and approach were instrumental in developing my own business skills.

Ex. O at 1.  Mr. Carey, Seth's current boss, also explained how Seth, as President, is invaluable to the business and to his leadership team:

> Upon Seth's arrival, our company's revenue saw an immediate increase, which was undoubtedly beneficial.  Yet, even more notable was the remarkable boost in our team's cohesiveness and efficiency.  Under Seth's leadership, underpinned by his expertise and enthusiasm, we transformed into a harmonious unit that genuinely enjoyed collaborating.  His approach resonated deeply with the team, and that positive impact persists to this day.

Ex. F at 2.  Seth has diligently worked to find success in a new role following his mistakes and taking of responsibility.

Importantly, Seth's acknowledgement of his role in the Iconix scheme has not been limited to his sworn testimony in court—he has been candid with his family, friends, and business associates, all of whom echo that he is deeply remorseful and apologetic.  Seth's wife, Lori, writes: "Although Seth's . . . actions caused stress on our marriage and family life, because of his constant honesty and communication we were able to find our way back to happiness and mutual respect for one another."  Ex. A at 2.  Lori also talks about how Seth has been honest and open with their children about his misconduct.  She writes, "they do know about Seth's 2019 guilty plea" and he has been "completely honest with all three of our children and answers all of their questions whenever they arise."  *Id.*  Matt Schwartz, Seth's college friend, writes that Seth "has expressed to me many times how he feels responsible for letting his friends and family down and for not being strong enough to stand up and say something right at the get go.  That being said, Seth has admitted to his role in the matter, accepts responsibility for his actions and

16

truly wants to make things right."  Ex. G at 2.  Seth's sister, Robin, similarly writes, "I am so proud of Seth for approaching this situation with morality and waking up each day with a positive outlook."  Ex. C at 2.  Seth's friend and professional associate Robert Friedman explains "it is clear to me that Seth fully comprehends his wrongdoing and, following that admission, was prepared to accept the consequences of his misguided actions."  Ex. L at 2.  Seth's current boss, Gregg Carey, describes how Seth was upfront about his mistakes when he interviewed him, remembering, "I was impressed and grateful with the vulnerability with which Seth freely shared details. The topic naturally raised many questions to which Seth answered in detail without defensiveness."  Ex. F at 1.  In short, Seth has demonstrated full awareness of the unlawfulness of his participation in the scheme to inflate Iconix's revenue and contrition for having participated.

Seth has paid an enormous price for the offense conduct.  In addition to being a principal witness at two high-profile trials, his career was irreparably altered.  He quit his job at Iconix; he was fired from his job at CEO of Baked By Melissa when he pleaded guilty.  For two years, Seth was unemployed.  He filled that time volunteer coaching, helping as an aide and substitute teacher in his children's schools and volunteering to do maintenance and animal relocation at local parkland.  His application to become a teacher was denied because of his pending sentencing.  He nonetheless never ceased to look for work, and after several years was able to complete a consulting project for an e-commerce apparel business.  In 2022, he was hired by that company, Section 119, first as the Vice President of Merchandising and then later promoted to President.  Section 119's CEO, Gregg Carey, values Seth's contributions "as both a mentor and a confidant" and admires Seth's character as valuing "collaboration, mutual growth, and authenticity."  *Id*. at 2.  As noted above, Mr. Carey describes how Seth's arrival at the company

17

created a "remarkable boost in our team's cohesiveness and efficiency.  Under Seth's leadership, underpinned by his expertise and enthusiasm, we transformed into a harmonious unit that genuinely enjoyed collaborating."  *Id.*  Seth's contributions to Section 119 are pivotal to the company's present success and but one example of his positive effect on the world and those he encounters.

## DISCUSSION

I.     **Legal Standard**

A.     **The Sentencing Factors**

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).  While a district court must consider the applicable Guidelines range under the United States Sentencing Guidelines ("Sentencing Guidelines"), "a sentencing court [cannot] presume that a sentence within the applicable Guidelines range is reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Sentencing Guidelines are "advisory").  Rather, a district court must impose a sentence that is "sufficient, but not greater than necessary" to accomplish the aims of sentencing law as applied to the defendant being sentenced.  18 U.S.C. § 3553(a).  The factors to be considered include, among others, "the nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence to reflect the offense's seriousness, the need to promote respect for the law, the need to provide just punishment, the need to adequately deter criminal conduct, and the need to avoid sentencing disparities.  *Id.*  The sentencing guidelines continue to be the "starting point and the initial benchmark" for sentencing, but a court is "generally free to impose sentences outside the recommended range" considering the Section 3553(a) factors.  *Cavera*, 550 F.3d at 189 (internal quotation omitted).

In fact, a district court is required to depart from the Sentencing Guidelines where a lower sentence would be sufficient to accomplish the aims of the sentencing factors. *See Pepper v. United States*, 562 U.S. 476, 487-89 (2011) (noting that the appropriate sentence for a defendant is based on the defendant's individual circumstances and that "the punishment should fit the offender and not merely the crime") (internal quotation omitted).

### B.    Substantial Assistance to the Government

In addition, a district court may depart from the Sentencing Guidelines to impose a lower sentence than the Guidelines range "if the prosecution makes a motion for a downward departure on the basis of the defendant's substantial assistance to the authorities." *United States v. Brown*, 98 F.3d 690, 693 (2d Cir. 1996). The court may reduce the sentence imposed based on "the court's evaluation of the significance and usefulness of the defendant's assistance," "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant," and "the nature and extent of the defendant's assistance." U.S.S.G. § 5K1.1(a). The sentencing factors and substantial assistance motion should be considered together in determining a cooperating witness's sentence. *See Brown*, 98 F.3d at 693.

### II.    The appropriate balance of the sentencing factors demonstrates that a noncustodial sentence is warranted here.

### A.    Seth has already rehabilitated for his participation in the fraud scheme and will not recidivate.

One of the factors a sentencing court should consider is whether a defendant is likely to recidivate. *See United States v. Wong*, 40 F.3d 1374, 1382 (2d Cir. 1994) (finding that the district court acted within its discretion in its consideration of the defendant's potential for rehabilitation). Evidence of this factor includes cooperation with the authorities and acceptance of responsibility for criminal conduct. *See United States v. Bradford*, 645 F.2d 115, 117 (2d Cir. 1981) ("A defendant's cooperation may, of course, be taken into consideration by a sentencing

19

judge as a mitigating factor tending to evidence his potential for rehabilitation.").  Further, first-time offenders are "less likely to recidivate than all other offenders."  *United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010); *see also United States v. Castillo*, No. 03 CR 835(RWS), 2007 WL 582749, at *7 (S.D.N.Y. Feb. 26, 2007) (noting that a "lack of any criminal history" warrants a downward variance from the recommended range of the Sentencing Guidelines).

As explained above, Seth reported fraudulent transactions at Iconix, recognizes the wrongfulness of his conduct, pleaded guilty to the charges brought against him, and cooperated with the SEC in its civil investigation and the government's prosecution of Mr. Cole, including by giving testimony in two criminal trials.  Seth pleaded guilty and cooperated with the government knowing that a conviction would impair his employability, career, and reputation. Seth's cooperation and acceptance of responsibility demonstrate that he is fully remorseful for his past conduct.

Further, Seth's personal history should give the Court comfort that he will not reoffend. In the nine years since the conduct at issue Seth has shown himself to be a man of character, integrity, honesty, and reliability.  As detailed above, Seth has strong connections to family, friends, and community.  Seth is ready to turn the page on this chapter of his life and continue to be the model citizen he has been in the past nine years.  Mr. Carey describes this best: "[h]is integrity, consistency, and genuine care for others, both in professional and personal capacities, paints a picture of a man deeply committed to positive growth, community, and service."  Ex. F at 2.  Moreover, Seth has no criminal history.  In light of Seth's background and appreciation for the wrongfulness of his conduct, the Court need not worry about specific deterrence.  A term of imprisonment is not warranted.

**B.      Sentencing Seth to time served is sufficient but not greater than necessary to accomplish the aims of the sentencing factors.**

Seth has already experienced collateral effects of his conduct.  He left Iconix, and while he initially found another job, he was terminated from that position following his guilty plea.  He was unemployed for two years before he was able to find work.  Seth has also faced substantial financial liabilities, including paying a substantial disgorgement to the SEC, funding his own attorneys' fees and expenses after entering his guilty plea, and ████████████████████

██████████████████████████████████████████████████████████████

██████████████      At the same time, Seth has experienced reputational harm because of his guilty plea and testimony at both of Mr. Cole's trials.  While he continues to have a strong circle of family and friends, he will suffer the mark of having been involved in the offense conduct for the remainder of his life, and anyone who searches his name will always be able to read about this case.  No would-be offender would look at the course of Seth's life since the investigation into Iconix began and look to repeat Seth's actions.

**C.      A noncustodial sentence without probation is warranted to avoid sentencing disparities.**

The sentencing statute also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Noncustodial sentences are frequently imposed for cooperating witnesses because "[s]ucuessful prosecutions frequently depend upon the credibility of cooperating witnesses in the eyes of the jury."  *United States v. Doe*, 348 F.3d 64, 68 (2d Cir. 2003).  Imposing a noncustodial sentence for a cooperating witness also "provid[es] an incentive for criminal defendants to cooperate with the government in the future."  *United States v. Singh*, No. 13-CR-570, 2014 WL 4773982, at *2 (E.D.N.Y. Sept. 18, 2014).  A downward variance from what the Sentencing Guidelines would impose for a cooperating witness provides "an

21

incentive to cooperate in the administration of justice." *United States v. Mariano*, 983 F.2d 1150, 1155 (1st Cir. 1993).

A noncustodial sentence without a term of probation is appropriate here. Two other cooperating witnesses were not prosecuted pursuant to immunity agreements. Mr. Cole—the scheme's leader—was sentenced to concurrent 18-month sentences, and a noncustodial sentence is appropriate for Seth in light of the Court's determination as to Mr. Cole.

### D.      A variance from the guidelines range is warranted here.

The guidelines range, as calculated by Government and the Office of Probation, does not accurately reflect Seth's role and a variance is warranted. The Presentence Investigation Report (Report) calculates a guidelines range of 51 to 63 months, based on an offense level of 24. A primary driver of the offense level for Seth in the report is the use of the approximate gain to Mr. Cole that resulted from the offense as the measure of loss. The gain amount—$790,200—is based on Mr. Cole's personal sale of approximately $40 million of Iconix stock in the fall of 2014, and the understanding that the value of those securities (and thus the amount retained by Mr. Cole in that sale) was inflated by approximately two percent. The attribution of Mr. Cole's stock sales to him increases Seth's guidelines range by 14 levels.

The testimonial record is in tension with the notion that Mr. Cole's stock sale in the fall of 2014 was within the scope of the criminal activity that Seth and Mr. Cole agreed to undertake. *See* U.S.S.G. § 1B1.3(a)(1)(B). While a theoretical sale by Mr. Cole was foreseeable, this particular transaction was not—indeed, it was contrary to what Mr. Cole had told Seth. Not only was Seth unaware of Mr. Cole's stock sale in 2014, but Mr. Cole had informed Seth that *he would not be selling stock* at that time, and neither should Seth. *See* Trial Tr. 375-76, Oct. 8, 2021; Trial Tr. 915-16, Nov. 8, 2022. Seth did not personally benefit from Mr. Cole's sale, had

no foreknowledge of it, and as such, it is not an accurate figure to use in Seth's offense level
calculation.

### III.     Seth Should Not Be Ordered To Pay Restitution To Iconix's New Owners.

Seth acknowledges that restitution may be ordered under 18 U.S.C. §§ 3663, 3663A, and
3664.  There are two independent reasons why Seth should not be ordered to pay any restitution
to Iconix.  First, case law in this District makes clear that Iconix is not a "victim" entitled to
restitution.  And second, any loss sustained by the current owners of Iconix should be
apportioned entirely to Mr. Cole.

#### A.     Restitution against Seth is unwarranted here because Iconix is not a statutory victim.

The Mandatory Victims Restitution Act ("MVRA") requires restitution to be imposed at
sentencing for certain offenses in favor of "victims."  18 U.S.C. § 3664.  A victim is defined as
"a person directly and proximately harmed as a result of the commission of an offense for which
restitution may be ordered[.]"  *Id*. § 3663A(a)(2).  Coconspirators are not victims within the
meaning of this provision.  *See United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006).  And, at
the same time, "federal law generally imposes liability on a corporation for the criminal acts of
its agents taken on behalf of the corporation and within the scope of the agent's authority via the
principle of *respondeat superior*."  *Fed. Ins. Co. v. United States*, 882 F.3d 348, 368 (2d Cir.
2018) (emphasis in original).  Courts recognize an exception to *respondeat superior* where "the
offense conduct solely furthered the employee's interests at the employer's expense (for
instance, where the employee was embezzling from the employer)."  *Id*.

In light of these principles, courts in this District have held that corporations such as
Iconix, whose stock was inflated pursuant to securities fraud schemes committed by officers, are
not properly considered "victims" under the federal restitution statutes.  In *United States v.*

*Block*, the district found that a company was not a victim under the restitution statute where its Chief Financial Officer was convicted of preparing fraudulent financial statements.  No. 16-CR-595 (JPO), 2018 WL 722854, at *5 (S.D.N.Y. Feb. 6, 2018).  Judge Oetken noted that the defendant-employee's actions fell "squarely within the scope of criminal conduct that is attributable to a corporate employer."  *Id*. at *3.  Pivotally, since the "direct and proximate effect of [the defendant's] conduct was to inflate [the company's] share price," the situation was distinct from ones where the defendant-employee was the sole beneficiary of his illegal conduct. *Id*.  Rather, the company could have been held criminally liable for the defendant's actions.  The fact that the company had subsequently cleaned house, hired all new senior management, had cooperated with government investigations, and been sold to a new owner, was not relevant to the analysis.  As Judge Oetken observes, "[t]he question is not whether the company transformed itself into a victim, but whether it was genuinely a victim – as opposed to a co-conspirator – at the time of the crimes."  *Id.* at *5.

Judge Rakoff reached the same conclusion in *United States v. Petit*.  541 F. Supp. 3d 304, 311 (S.D.N.Y. 2021).  *Petit* similarly involved criminal convictions of officers involved in a fraudulent scheme to inflate their company's reported revenues.  Judge Rakoff found that, although the defendants' criminal conduct was "motivated by personal financial gain," since the effect of their conduct was share price inflation, their conduct occurred within the scope of their employment.  *Id*. at 310.  This was particularly apt in *Petit* where the misconduct was committed by the most senior officers of the company.  *Id.* at 311.  The company was therefore not a statutory victim and not entitled to restitution.

So too here.  Mr. Cole was the CEO of Iconix; Seth served as its COO.  The joint ventures at issue in this case were negotiated within the scope of their employment, inflated

24

Iconix's reported revenue and earnings per share, with the effect of inflating Iconix's share price.

Accordingly, as with the defendants in *Block* and *Petit*, the conduct for which both Mr. Cole and

Seth were charged and convicted occurred within the scope of their employment.  Iconix could

have been – but ultimately was not – charged as a result of the defendants' conduct.  For the

same reasons that the corporate employers in *Block* and *Petit* were not victims under the

restitution statutes, Iconix is not a victim within the meaning of the MVRA and not entitled to

restitution from Seth.

As Judge Rakoff notes in footnote 6 of the *Petit* decision, that the corporate employer is

not a victim under the restitution statute does not mean that it is left without potential recourse to

recover at least some of its losses – and MiMedx in that case had sued to recover fees it had

advanced to the defendants.  *Id.* at 310 n.6.  So too here.  ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex.

V § 4.

### B. Even if Iconix is a statutory victim, Seth should not be accountable for Iconix's costs associated with the government's investigation and prosecutions of Mr. Cole.

When multiple defendants contributed to a victim's loss, the Court is authorized to

impose restitution in the full amount jointly and severally on all defendants, or it "may apportion

liability among the defendants to reflect the level of contribution to the victim's loss and

economic circumstances of each defendant."  18 U.S.C. § 3664(h).  This decision is committed

to the discretion of the district court.  *See United States v. Nucci*, 364 F.3d 419, 422 (2d Cir.

2004).  Seth respectfully submits that were the Court to find that losses incurred by Iconix are

subject to restitution, then liability for Iconix's losses should be apportioned individually in this

case, and to Mr. Cole.

The current owners of Iconix, Lancer Capital LLC ("Lancer"), purchased the company in June 2021 in an all-cash transaction.[2]  While the current owners may have incurred fees and expenses in connection with the two trials of Mr. Cole, none of those fees and expenses should be apportioned to Seth.  Seth pleaded guilty *over a year and a half before* Lancer's acquisition. He has entirely self-funded his attorneys' fees and expenses arising from his cooperation with the DOJ and his participation in Mr. Cole's two trials.  Every penny expended by the current owners of Iconix on this criminal investigation is a product of Mr. Cole's criminal prosecution, and not the guilty plea entered by Seth. ███████████████████████

█████████████████████████████████████████████████

████████████████████████████ Ex. V § 2.

Applying the factors set forth is 18 U.S.C. § 3664(h), any loss that may be ordered as restitution to Iconix should be attributed and allocated to Mr. Cole.

## CONCLUSION

Seth has taken full responsibility for his conduct at Iconix and has provided extraordinary cooperation to the SEC and DOJ.  The conduct at issue occurred almost ten years ago, and he has already paid dearly for those offenses.  We respectfully request a sentence of time served without a term of probation.

---

[2] *See Iconix Enters into Definitive Agreement to be Acquired in "Go Private" Transaction*, GLOBENEWSWIRE (June 11, 2021), https://www.globenewswire.com/news-release/2021/06/11/2245934/0/en/Iconix-Enters-into-Definitive-Agreement-to-be-Acquired-in-Go-Private-Transaction html ("Iconix Brand Group, Inc. (Nasdaq: ICON) ("Iconix" or the "Company") today announced it has entered into a definitive agreement and plan of merger to be acquired by Iconix Acquisition Corp., an affiliate of Lancer Capital, LLC ("Purchaser"), in an all-cash transaction that values Iconix at approximately $585 million, including net-debt.").

Date: 11/02/2023

By: */s/ Anjan Sahni*
    Anjan Sahni
    Brendan McGuire
    Rachel E. Craft
    Wilmer Cutler Pickering Hale and Dorr LLP
    250 Greenwich Street
    New York, NY 10007
    Tel: (212) 937-7418
    Fax: (212) 230-8888
    anjan.sahni@wilmerhale.com
    brendan.mcguire@wilmerhale.com
    rachel.craft@wilmerhale.com

    Mark D. Cahn*
    Wilmer Cutler Pickering Hale and Dorr LLP
    2100 Pennsylvania Avenue NW
    Washington, DC 20037
    Tel: (202) 663-6349
    mark.cahn@wilmerhale.com
    *Pro hac vice application forthcoming*

    *Counsel for Seth Horowitz*

27