

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 9, 2023

**BY ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    <u>**United States v. Seth Horowitz**</u>**, 19 Cr. 861 (ER)**

Dear Judge Ramos:

    The Government respectfully submits this letter in connection with the sentencing of the defendant, Seth Horowitz, which is scheduled for November 16, 2023 at 3:30 p.m., to advise the Court of the pertinent facts concerning the substantial assistance rendered by Horowitz in a significant securities fraud investigation and prosecution.

    As detailed below, Horowitz's cooperation was not only substantial but extraordinary. The prosecutors in this matter are hard-pressed to think of another cooperating witness who has approached the cooperation process with as much dedication, patience, and earnest remorse as Horowitz. Horowitz began cooperating before he was charged, met with the Government approximately 50 times (an unusually high number necessitated by the complexity of the subject matter and a retrial), and maintained his dedication to the cooperation process and his professionalism in the face of serious consequences stemming from his cooperation. Additionally, Horowitz was an extremely valuable cooperator. He was the Government's most important witness in a significant corporate fraud case, and he provided credible, devastating, and emotionally compelling testimony.

    In light of these facts, and assuming that Horowitz continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), that the Court sentence Horowitz in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

**Personal and Professional Background**

Horowitz was born in Brooklyn, New York. He graduated with a bachelor's degree in international marketing from George Washington University in 1998.

Following college, Horowitz began working at the sports apparel and equipment company Everlast, which was owned by his father. After his father's death in 2005, Horowitz became the CEO of Everlast. Horowitz then worked as an executive at the sporting goods company Modell's between 2008 and 2011, rising to the position of president. Horowitz worked at Iconix between 2012 and 2015, where the offense conduct occurred.

After leaving Iconix, Horowitz served as the CEO of the baked goods company Baked by Melissa between 2016 and 2019. Horowitz was terminated by Baked by Melissa when his guilty plea in this matter was unsealed in 2019, and he was unemployed for the next several years. Horowitz attempted to obtain employment as a schoolteacher, but his previous employer, the CEO of Baked by Melissa refused to provide a reference for him. In 2022, Horowitz began working for an e-commerce clothing company, first as a consultant and then as president, which is his current position.

Horowitz currently resides in New Jersey with his wife and three school-age children.

**Offense Conduct**

The offense conduct in this matter relates to Horowitz's actions while serving as the CFO of Iconix Brand Group ("Iconix" or the "Company"). Iconix managed various clothing and fashion brands, typically by acquiring the rights to the brand name and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products to retail customers. Iconix's shares traded publicly on the Nasdaq stock exchange. As a publicly traded company, Iconix periodically filed disclosures with the U.S. Securities and Exchange Commission. Iconix's filings reported quarterly and annual revenue and earnings per share ("EPS"), among other information, which Iconix's former CEO Neil Cole certified as accurate. (*See, e.g.*, GX 103-A & B (2Q 2014 8K certifications); GX 105-A & B (3Q 2014 8K certifications); GX 107-A & B (2014 10K certifications)). Iconix executives, including Cole and Horowitz, publicly emphasized revenue and EPS as the principal metrics demonstrating Iconix's growth. Cole and Horowitz also touted Iconix's consistent record of revenue and earnings growth and of meeting or exceeding Wall Street analyst consensus with respect to these metrics. (*See, e.g.*, GX-100, GX-104, GX-106 (press releases)).

Iconix used joint ventures ("JVs") to profit from its brands in foreign markets. In a typical JV arrangement, Iconix created a subsidiary, transferred ownership of a trademark or brand to that subsidiary, and then transformed the subsidiary into a JV by selling a 50 percent ownership interest in the JV to another business pursuant to a joint venture agreement. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue. From an accounting perspective, when Iconix entered into a JV, Iconix recognized as revenue the purchase price paid to Iconix by the JV partner, less Iconix's cost basis in the trademarks. Accordingly, the

higher the price paid to Iconix by the JV partner, the more revenue Iconix could report on its financial statements.

From 2014 to 2015, Horowitz participated in a scheme to falsely inflate Iconix's reported revenue and EPS by inducing a Hong Kong-based JV partner, Global Brands Group Asia Limited ("GBG"), to purchase JV interests at artificially inflated prices based on a promise to reimburse GBG for the overpayments. Each of these JV agreements involved a fraudulent "round trip" transaction, lacking in economic substance, in which GBG paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Iconix's agreement to give back the inflated portion of the purchase price to GBG. Horowitz and Neil Cole knew that these arrangements were improper, and they hid the inflated purchase prices and offsetting round-trip payments from Iconix's lawyers and outside auditors.

Neil Cole was the principal architect of the scheme, and he negotiated the terms of the illicit deals with GBG executive Jason Rabin. Specifically, Cole arranged for Iconix to enter into JVs with GBG that included inflated buy-in purchase prices on multiple occasions relating to a joint venture in Southeast Asia, including the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3") (collectively, the "SEA JVs"). (*See, e.g.*, Second Trial Tr. 652 (Horowitz: the deal price "went up in that fashion because we had agreed to give the $5 million back to GBG in the future"); Second Trial Tr. 816 (Horowitz: "GBG had a financial commitment of $6 million in guaranteed minimum royalties that we would let them out of in exchange for the inflated price"); Second Trial Tr. 406 (Rabin: "Neil said if I raised the price by $5 million, we could bill it back for marketing."); Second Trial Tr. 1710 (Margolis: Rabin said the SEA-2 deal price jump up by $5 million because "we would get the money back" from Iconix)). Horowitz assisted Cole in carrying out the scheme principally by communicating with GBG at Cole's direction and helping coordinate the creation of fake documentation relating to the scheme. Cole and Horowitz executed the scheme so that Iconix could hit its financial targets, such as Wall Street's expectations about the company's quarterly EPS and revenue results. (*See* Second Trial Tr. 651 (Horowitz: "We inflated the prices of the joint ventures with promises of givebacks in order to hit our financial goals.")).

The Government also introduced evidence that Neil Cole and his collaborators in fact sent the money back—as promised—for SEA-2. In that transaction, Cole approved $5 million in roundtrip payments disguised as payments for marketing expenses. (*See* Second Trial Tr. 800 (Horowitz: "These invoices were just a cover, something to pass a sniff test, in order to get the money back to GBG for the June joint venture."); 416 (Rabin)). But marketing expenses were supposed to be borne by the JV itself and not by Iconix. In order to hide the fraudulent nature of the $5 million roundtrip payment, Cole used sham marketing invoices in amounts that, in the words of the Iconix employee who actually performed the marketing work reflected in the sham invoices, were "utterly, utterly out of keeping" and "ludicrously out of whack" with the value of the work. (*See* Second Trial Tr. 1623 (Laramy-Binks)). And the Government introduced evidence that Neil Cole, Horowitz, and their GBG conspirators explored still further ways to return the SEA-3 overpayment, including by excusing millions of dollars in royalty payments (*see* Second Trial Tr. 415 (Rabin)), or by hiding the payment in a joint venture relating to the Middle East and North Africa, (*see* Second Trial Tr. 985 (Horowitz), 2556 (Cole)). Cole's actions with respect to SEA-2

3

and SEA-3 had a material impact on the accounting and Iconix's auditor would have wanted to know about them before reviewing Iconix's financial statements. (*See* Second Trial Tr. 2017-20, 2027, 2041-42, 2049 (Shapiro)).

In late 2014 and early 2015, the SEC Division of Corporation Finance ("Corp Fin") inquired of Iconix about its accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Neil Cole panicked when Iconix received the Corp Fin inquiry because he believed it could reveal his accounting fraud scheme, and he planned to engage in a further cover up of his crimes. Around this time, Cole also began speaking about using other Iconix employees as "fall guys" for his misconduct. (Second Trial Tr. 1006).

Although the SEC directed Iconix to disclose to the SEC the "business purpose" and material terms of the SEA JVs, Cole and Horowitz intentionally and falsely omitted from an Iconix response letter to the SEC that GBG had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for Cole's secret agreement that Iconix would reimburse GBG for these overpayments. (Second Trial Tr. 1000, 1009-12 (Horowitz)).

At Cole's direction, Horowitz destroyed physical documents that were evidence of the scheme, and Horowitz sought to delete incriminating emails (which were ultimately recovered despite Horowitz's efforts).

## Procedural History

The accounting fraud at Iconix came to light on April 13, 2015, when Horowitz resigned from his role as COO and sent a letter to the company's board of directors in which he described roundtrip transactions. Horowitz was prompted to write the letter after Cole's behavior became increasingly erratic raising a concern in Horowitz's mind that Cole would seek to use him as a "fall guy." Horowitz's resignation letter triggered an internal investigation by Iconix, the dismissal of Cole, a financial restatement by Iconix, and, ultimately, an investigation by the SEC's enforcement division. However, it was not until late 2018 that this Office opened a criminal inquiry.

In November 2018, Horowitz first learned of the Government's investigation when Government counsel approached his lawyers to inquire about his interest in cooperation. On December 3, 2018, Horowitz's lawyers provided an attorney proffer to investigators from this Office, the FBI, and the SEC. On December 10, 2018, Horowitz sat for his first proffer with the Government. Horowitz began proffering before any criminal charges were brought in the Government's investigation into misconduct at Iconix. Over the course of numerous proffer sessions, Horowitz provided credible and detailed information to the Government about misconduct committed by senior executives at Iconix and GBG, including but not limited to former Iconix CEO Neil Cole and former GBG executives Jason Rabin, Jared Margolis, and Ethan Cole. Investigators from the SEC also attended many of those meetings as part of a parallel investigation.

On or about December 2, 2019, Horowitz pled guilty pursuant to a cooperation agreement to Information 19 Cr. 861 (ER), which charged him with one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits;

one count of securities fraud; one count of making false filings with the SEC; one count of improperly influencing the conduct of audits; and one count of conspiracy to destroy, alter, and falsify records in federal investigations.

On December 4, 2019, a grand jury returned an indictment charging Cole in ten counts (the "Cole Indictment"). The Cole Indictment charged Cole with one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits; one count of securities fraud; six counts of making false filings with the SEC; one count of improperly influencing the conduct of audits; and one count of conspiracy to destroy, alter, and falsify records in federal investigations.

On December 5, 2019 the SEC brought an enforcement action against Iconix, Cole, Horowitz, and former Iconix CFO Warren Clamen. Iconix, Horowitz, and Clamen all agreed to settle that suit at the time it was brought.

Horowitz testified at two trials relating to Neil Cole's accounting fraud at Iconix, including an initial trial in 2021 and a retrial in 2022. At Cole's first trial, in October 2021, Horowitz testified for approximately five days. At the conclusion of that trial, the jury failed to reach a unanimous verdict on the eight substantive counts in the Cole Indictment (Counts Two through Nine), and acquitted Cole on the two charged conspiracy counts (Counts One and Ten). At Cole's retrial, in November 2022, Horowitz again testified for approximately five days. At the conclusion of the retrial, the jury returned a verdict of guilty on each remaining count of the Cole Indictment.

On October 10, 2023, this Court sentenced Neil Cole to 18 months' of imprisonment and ordered him to forfeit $790,200.

## The Presentence Investigation Report and the Applicable Guidelines Range

The U.S. Probation Department prepared a presentence investigation report and filed the final version on October 18, 2023. In the PSR, Probation calculates the applicable Guidelines to be 51 to 63 months' imprisonment, based upon an offense level of 24 and a criminal history category of I. (PSR ¶ 110). Probation arrives at the offense level of 24 by (a) assigning a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A); by increasing the offense level by 14, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), to reflect the gain of $790,200 to co-conspirator Neil Cole from the offense; by increasing the offense level by 4, pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(i), to reflect that the defendant committed the offense while an officer of a public company; by increasing the offense level by 2, pursuant to U.S.S.G. § 3C1.1, because the defendant obstructed justice by conspiring to destroy, alter and falsify records during the course of the SEC investigation; and by decreasing the offense level by 3, pursuant to U.S.S.G. § 3E1.1, in light of the defendant's acceptance of responsibility.

Horowitz's counsel opposes the 14-level loss amount enhancement based on Cole's sale of approximately $40 million in Iconix stock in October 2014, which resulted in an additional approximately $790,200 in profits for Cole due to the accounting fraud scheme artificially inflating the Company's stock at the time by approximately 2%. Horowitz's counsel argues that while it may have been reasonably foreseeable to Horowitz that Cole would sell Iconix stock at some point

to benefit from their scheme, Cole's October 2014 stock sale was not within the scope of their jointly undertaken criminal activity because Horowitz was not aware of the sale until after it occurred, and Cole only told Horowitz that Cole planned to sell stock in spring of 2015 (as opposed to October 2014).  The Government believes that Horowitz's lack of awareness of the timing of the specific stock sale does not remove that conduct from being part of his joint fraudulent undertaking with Cole.  Horowitz helped Cole execute the scheme, and knew that Cole intended to sell stock to take advantage of the scheme's effect on the Company's stock price; that is sufficient to make it part of their jointly undertaken criminal activity.

The parties and Probation also agree that Horowitz will satisfy the requirements for a two-level decrease set forth in  proposed amendment U.S.S.G. § 4C1.1, which operates to reduce a defendant's offense level by 2 points when the defendant is a person: (1) with no criminal history points; (2) who did not receive a terrorism enhancement, (3) who did not use violence or threats of violence, (4) who did not cause death or serious injury, (5) who did not commit a sex offense, (6) who did not cause any victim substantial financial hardship, (7) who did not possess or use a firearm or deadly weapon, (8) who did not violate a victim's civil rights, (9) who did not commit a hate crime, and (10) who did not receive a role adjustment. U.S.S.G. § 4C1. The Government does not contest that Horowitz meets all the required criteria, and has no objection to the Court applying the two-level reduction now provided that Horowitz's counsel confirm, on the record, that the defense will not later seek a sentencing reduction pursuant to 18 U.S.C. § 3582 on the basis of the amendment.

Based on the foregoing calculations, Horowitz's Guidelines range is 41 to 51 months' imprisonment.

### Cooperation and Significance of Assistance

Horowitz's cooperation was not only substantial but extraordinary.  As discussed in greater detail below, Horowitz began cooperating before he was charged; met with the Government approximately 50 times for hours on end; was the Government's most important witness in a significant corporate fraud case, during which he provided credible, devastating, and emotionally compelling testimony; and maintained his dedication to the cooperation process and his professionalism in the face of serious consequences stemming from his cooperation.

*Timeliness of Horowitz's Cooperation*

As discussed, Horowitz's April 2015 letter was the triggering event that exposed the accounting fraud at Iconix and set off the internal investigation, subsequent restatement, and, ultimately, civil and criminal inquiries.  As he explained in his trial testimony, Horowitz crafted the letter with the aim of providing Iconix's Board of Directors with sufficient information to investigate and fix the company's accounting, which he felt was important, while also seeking to avoid implicating himself in criminal conduct.  While Horowitz did not fully admit his own culpability in the letter, his decision to part ways with Cole and draw the Board's attention to the roundtripping when it was far from clear that it would otherwise be discovered was a brave and difficult decision for which he deserves substantial credit.  Indeed, but for Horowitz's resignation

letter, it is not certain that Horowitz's and Cole's criminal conduct would have ever fully come to light.

And although Horowitz's letter to the board was vague about whether he had intentionally committed misconduct at Iconix, it should be noted that since his earliest interactions with civil enforcement authorities and criminal investigators, Horowitz has consistently admitted to wrongdoing and expressed his desire to cooperate. This is significant. In many securities fraud investigations, defendants are unwilling to cooperate until after charges have been brought. Horowitz, however, began meeting with the Government before he was even charged in this matter and only a month after learning of the existence of the criminal investigation.

Horowitz's cooperation was "timely" in another respect as well. As discussed above, Horowitz's first meeting with criminal investigators occurred in December 2018. At that time, the criminal investigation had only recently begun, and Horowitz played an important role in helping the prosecutors and FBI agents to understand what happened at Iconix and which conduct was appropriate for criminal prosecution. The internal investigation and subsequent SEC inquiry had revealed over a dozen questionable transactions that occurred at Iconix over the course of multiple years. While Horowitz was not a significant player in many of these transactions, in the initial months of his cooperation, he spent hours meeting with investigators and sharing what he knew about a staggering array of conduct – and even more hours on his own time pouring over documents in an effort to refresh his memory and identify helpful corroboration to his account.

With respect to the SEA-2 and SEA-3 transactions that became the focus of the Government's case, Horowitz met repeatedly with the Government to help investigators understand the complex fact pattern in this matter, including thousands of pages of relevant document. Horowitz's information and anticipated testimony were a substantial factor in the Government's ability to bring charges against Cole.

The Government thus considers Horowitz's cooperation to have been extremely timely.

*The Value of Horowitz's Cooperation*

Horowitz's cooperation has been highly valuable and useful. He provided credible and important information about significant fraudulent activity committed by multiple individuals, including former Iconix CEO Neil Cole and GBG executives Jason Rabin, Jared Margolis, and Ethan Cole.

Horowitz's information was a significant factor in the Government's ability to charge Neil Cole in December 2019 and ultimately obtain multiple guilty verdicts against Cole. Prior to the Cole Indictment, Horowitz spent many hours helping prosecutors understand complex financial records and the nuances of how Cole orchestrated the accounting fraud scheme. Horowitz even affirmatively flagged for prosecutors important documents whose significance was not initially clear to the Government, such as certain financial forecasting documents. Investigators from the SEC also attended many meetings with Horowitz as part of a parallel investigation, and the Government understands that SEC investigators found Horowitz's information extremely useful

in bringing enforcement actions against Cole, Clamen, Iconix, and Horowitz himself in December 2019.

Horowitz was unquestionably the single most important witness against Cole at both of his trials. Horowitz's testimony at the trials was credible and compelling, and it provided an important narrative picture of Cole's central role in the accounting fraud scheme. Without Horowitz's cooperation, the Government would not have been able to present a first-person account of internal Iconix deliberations about the fraud, and would not have had a witness who could interpret key documents whose meaning may not have been clear on their face. Presenting a first-person narrative of an offense is helpful in any criminal trial, but it is especially valuable in a complex white-collar matter dealing with a dry topic such as accounting fraud. Despite that subject matter, Horowitz's testimony was not only clear and easy to understand, at times it was also dramatic and gripping. For example, Horowitz testified at trial about Cole's emotional outbursts and threats, and about how Cole said he planned to lie to government regulators even if Horowitz came clean:

> Neil would threaten me that my career was over and that I would no longer be able to work at a public company. He said something to the effect that he knew about the transactions but that he could pass a lie detector test saying he didn't but he knew I could too, essentially building he-said-versus-he-said scenario.

(Second Trial Tr. 994). This testimony provided powerful evidence of Cole's criminal intent, and this Court remarked at Cole's sentencing about how the Court credited Horowitz's testimony (and discredited Cole's conflicting testimony as perjurious). Although the jury in the first trial did not convict Cole, the Government does not attribute this to any lack of credibility on the part of Horowitz.

The Neil Cole case was an important fraud prosecution for the Government. Cole was a wealthy and powerful corporate executive who organized a calculated, long-running, and sophisticated fraud scheme. The Government believes that such prosecutions provide critical general deterrence to public company executives who would consider engaging in financial shenanigans, and demonstrate to the broader public that powerful corporate leaders who engage in criminal activity will face accountability. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (citation and internal quotation marks omitted); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

While the Government ultimately made a determination not to charge any GBG executives—individuals who did not work at the company where the accounting fraud occurred, and arguably did not have the same level of visibility into Iconix's internal finances and processes—Horowitz's information helped the Government develop Rabin and Margolis as witnesses against Cole, who was the ringleader of the scheme. Horowitz's information about Rabin and Margolis put the Government in a better position to confront those witnesses about their

8

participation in a roundtripping scheme during the investigative phase of this case, and ultimately elicit truthful testimony at trial from Rabin and Margolis about Cole's misconduct.

In sum, Horowitz provided highly significant and useful assistance.

*Horowitz's Truthfulness and Reliability*

Horowitz has been a truthful and reliable witness, and has shown a remarkable degree of self-awareness and an admirable willingness to acknowledge his mistakes. While many white-collar cooperators have difficulty acknowledging that they intended to commit fraud, Horowitz admitted his participation in Neil Cole's accounting fraud scheme at his first meeting with the Government. While Horowitz did minimize certain aspects of his conduct in some earlier meetings, over the course of meeting with the Government he came to acknowledge the full extent of his knowledge and involvement in the scheme. Horowitz was forthcoming about his own misconduct and the misconduct of others, and his information was extensively corroborated by other evidence.

Horowitz also appeared genuinely remorseful for his misconduct, and to be disappointed with himself for straying down a dishonest path. He did not significantly profit from his participation in the scheme, and his misconduct seems to have been motivated in large part by a desire to succeed in the business world and please his boss. Horowitz's participation in Cole's fraud appears to be an aberration, an unhealthy product of Cole's domineering influence and Horowitz's professional ambition. Horowitz appears to have viewed the cooperation process not only as a path to a potentially more lenient sentence, but as a sort of cathartic process to make up for his past misconduct. This approach gave the Government great confidence in the truthfulness and reliability of Horowitz's information and testimony.

*Professional and Personal Consequences from Cooperation*

Horowitz suffered significant financial and personal repercussions from his cooperation and guilty plea. Horowitz was terminated from Baked by Melissa after his guilty plea was unsealed, and he was not able to obtain a teaching license due to his pending criminal case. The Government also understands that Horowitz's cooperation over the course of approximately five years—spanning the COVID pandemic and two trials—has caused him a great deal of stress and anxiety. Horowitz provided approximately ten days of testimony over the course of two separate trials, during which he was subject to extensive cross-examination about his personal and professional life. At the first trial in particular, Neil Cole's counsel unnecessarily publicized personally embarrassing information about Horowitz in open court. Your Honor precluded questioning on that topic and sealed the relevant part of the transcript, but at least one media outlet nonetheless reported on the information, which had significant negative repercussions for some of Horowitz's personal relationships.

The Government also placed substantial demands on Horowitz in terms of his time and attention over the course of his years of cooperation, meeting with him on approximately 50 occasions for debriefings and trial preparation. Most of those meetings lasted a number of hours, and some took place on weekends and evenings. Horowitz made himself available to the

Government whenever he was requested to do so, without complaint, even when it interfered with time that would otherwise have been spent with his family.

## Conclusion

As set forth above, the Government believes that Horowitz provided substantial assistance to the Government. Accordingly, as discussed, assuming Horowitz continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence Horowitz in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/
Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Scott Hartman
Assistant United States Attorneys
Southern District of New York

cc: Anjan Sahni, Esq. (by ECF)